**GOSS INTERNATIONAL CORPORATION, a Delaware corporation, Plaintiff,**

v.

**TOKYO KIKAI SEISAKUSHO, LTD., a Japanese corporation and TKS (U.S.A.), Inc., a Delaware corporation, Defendants.**

**No. C00–35 LRR.**

United States District Court, N.D. Iowa, Cedar Rapids Division.

June 15, 2006.

Bradley P. Nelson, Ian H. Fisher, Jose A. Lopez, Steven A. Weiss, William G. Schopf, Schopf & Weiss, Chicago, IL, John R. Shane, Wiley Rein & Fielding LLP, Washington, DC, Patrick M. Roby, Robert M. Hogg, Elderkin Law Firm, Cedar Rapids, IA, for Plaintiffs.

Barry J. Reingold, Perkins Coie, LLP, Lawrence R. Walders, Neil R. Ellis, Sidley Austin Brown & Wood, LLP, Washington, DC, Hoken S. Seki, Hoken S. Seki Law Offices, Lake Forest, IL, Nicholas V Critelli, Jr., Nicholas Tre Critelli, III, Nicholas Critelli Assoc., Des Moines, IA, Peter

J. Toren, Sidley Austin Brown & Wood, LLP, New York City, for Defendants.

**ORDER**

READE, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ................................................. 922

II. BACKGROUND ................................................ 922

III. THE MERITS .................................................. 923
 A. Summary of Argument ..................................... 924
 B. Foreign Anti–Suit Injunctions Generally ................... 924
 C. Standards for Granting a Preliminary Injunction: Dataphase factors ..... 926
 1. Likelihood of success on the merits ................................ 926
 a. Preliminary considerations .................................... 927
 b. Circuit split ................................................. 928
 c. Analysis ..................................................... 928
 2. Threat of irreparable harm .................................... 930
 3. Balance of harms ............................................. 931
 4. Public interest ............................................... 931
 5. Conclusion .................................................. 931

IV. DISPOSITION ................................................. 931

### I. INTRODUCTION

Before the court is the Motion for Preliminary and Permanent Injunctions ("Motion"), filed by Plaintiff Goss International Corporation ("Goss") (docket no. 512).

### II. BACKGROUND

On December 3, 2003, a jury returned a verdict in favor of Goss on its claims that Defendants Tokyo Kikai Seisakusho, Ltd. and TKS (U.S.A.), Inc. (collectively "TKS") engaged in dumping in violation of the Antidumping Act of 1916, 15 U.S.C. § 72 (1994) ("1916 Act"). The jury awarded damages to Goss totaling $10,539,949.00. On December 4, 2003, pursuant to the 1916 Act's provision for treble damages, the court entered judgment in favor of Goss against TKS in the amount of $31,619,847.00, with interest thereon at the rate provided in 28 U.S.C. § 1961, and costs. On June 2, 2004, the court awarded Goss attorneys' fees and expenses in the amount of $3,484,158.00 and taxed costs against TKS in the amount of $681,475.05.

On June 23, 2004, TKS filed a Notice of Appeal, in which it challenged all adverse rulings by the court.

On December 3, 2004, Congress repealed the 1916 Act. Miscellaneous Trade & Technical Corrections Act of 2004, Pub.L. No. 108–429, § 2006(a), 118 Stat. 2434, 2597 (2004). However, Congress excluded all pending actions from the repeal. *Id.* § 2006(b). Therefore, the repeal does not affect this case. *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 434 F.3d 1081, 1083 (8th Cir.), *reh'g and reh'g en banc denied*, (8th Cir. 2006).

On December 8, 2004, a new law came into force in Japan. Law No. 162 is entitled *Amerika gasshuukoku no 1916 nen no han futuo renbai hou ni motoduki uketa rieki no henkan gimu tou ni kansuru tokubetsu sochi hou* or "Special Measures Law Concerning the Obligation of Return of the Benefits and the Like under the United States Antidumping Act of 1916" ("Japanese Special Measures Law"). The law, a so-called "clawback statute,"[1] au-

---

1. Generally speaking, a clawback statute is a statute that enables a defendant who has paid

thorizes Japanese parties, against whom a U.S. judgment has been rendered under the 1916 Act, to sue in Japan to recover the full amount of the judgment, interest and expenses, including attorney fees. Japanese Special Measures Law art. 3. It renders all wholly-owned parent companies and subsidiaries of the prevailing plaintiff in the U.S. action jointly and severally liable for the clawback judgment.[2] *Id.*

Pursuant to a stipulation filed by the parties ("2004 Stipulation"), in late 2004 the court ordered that (1) "TKS shall not file suit or assert or attempt to assert any rights or remedies under the [Japanese Special Measures Law] ... before all appeals, including without limitation any motion for rehearing or petition for certiorari, in this case are exhausted" and (2) "TKS shall provide Goss' counsel of record with fourteen (14) days' prior written notice before filing suit or asserting or attempting to assert any rights or remedies under the [Japanese Special Measures Law] ...."

On January 23, 2006, the Eighth Circuit Court of Appeals affirmed the court's judgment in all respects. *Goss,* 434 F.3d at 1099. On April 14, 2006, the Eighth Circuit Court of Appeals denied TKS's Motions for Rehearing and Rehearing En

Banc. On June 5, 2006, the Supreme Court denied TKS's Petition for a Writ of Certiorari. *Tokyo Kikai Seisakusho, Ltd. v. Goss Int'l Corp.,* — U.S. ——, 126 S.Ct. 2363, 165 L.Ed.2d 280 (2006).

On June 5, 2006, hours after the Supreme Court denied TKS's petition for a writ of certiorari, TKS gave Goss notice that it intended to file suit and assert its rights under the Japanese Special Measures Law. Pursuant to the 2004 Stipulation and the court's order enforcing it, under the *status quo,* TKS may file suit in Japan under the Japanese Special Measures Law on June 19, 2006.

On June 8, 2006, Goss filed the instant Motion. On June 12, 2006, TKS filed a Resistance. On June 14, 2006, the court held a hearing ("Hearing") on the Motion, insofar as it requests a preliminary injunction.[3] Attorneys William Schopf and Ian Fischer represented Goss. Attorneys Peter Toren, Honken Seki, Donald Renaldo and Nicholas Critelli represented TKS. The Motion is fully submitted, and thus the court turns to consider it.

## III. THE MERITS [4]

### A. Summary of Argument

In the Motion, Goss asks the court for a foreign anti-suit injunction. That is, Goss requests a

judgment damages in an overseas country to recover that judgment from the successful plaintiff in the defendant's home country. *See* Joseph E. Neuhaus, *Power to Reverse Foreign Judgments: The British Clawback Statute Under International Law,* 81 Colum. L.Rev. 1097, 1097–98 (1981).

2. The clawback statute is not unique to Japan. The European Union has a similar provision. On December 15, 2003, the European Council promulgated a similar clawback regulation. *See* Council Regulation (EC) No. 2238/2003 of December 15, 2003, O.J. (L 333). The European Council regulation authorizes nationals and residents of the European Union to sue for recovery of damages, costs and miscellaneous expenses suffered in the United States as a consequence of the 1916 Act from the plaintiff in the 1916 Act action or from cer-

tain entities related to that plaintiff. The clawback statutes were enacted because it is the position of Japan and the European Union that the 1916 Act violates the United States's obligations under a 1994 World Trade Agreement regarding antidumping legislation. *See generally Goss,* 434 F.3d at 1090 n. 5 (discussing international legal aspects of 1916 Act).

3. At the Hearing, it became clear that, at this time, only the preliminary injunction is at issue. The court shall reserve ruling on the Motion insofar as Goss requests a permanent injunction. In due course, the court shall set a briefing schedule on the permanent injunction request.

4. At the Hearing on TKS's Emergency Motion for Continuation of Stay of Enforcement of

preliminary ... injunction[ ] enjoining [TKS] and their representatives, officers, directors, agents, attorneys, employees, and shareholders, and anyone acting in concert with them, from asserting or attempting to assert or pursue any rights or remedies granted under [the Japanese Special Measures Law] against Goss or any of its affiliates or subsidiaries.

Goss contends that the Japanese Special Measures Law "directly attacks the [c]ourt's final jurisdiction and judgment." Goss points out that "the sole basis for Goss's liability under the Japanese [Special Measures Law] is Goss's receipt of damages awarded by this [c]ourt."

Goss contends an injunction is necessary to protect the court's jurisdiction and its judgment from "imminent danger of being invalidated and undone." Goss contends that it is fundamentally unfair for a company, like TKS, to do business in the United States for decades, intentionally violate the laws of the United States, litigate in the United States' federal courts for more than six years, and then "thumb its nose at this [c]ourt and the federal judiciary by taking advantage of special legislation in Japan ...." Goss points out that TKS recently announced its plans to continue to do business in the United States "for years to come" and to "compete vigorously for new business and services in the United States." (Hearing Exhibit 2).

TKS resists Goss's request for a foreign anti-suit injunction. TKS strenuously objects to Goss's characterization of its activities and denies it is "thumbing its nose" at the federal judiciary. TKS contends that Goss has not demonstrated that the court should grant a preliminary injunction. TKS urges the court to "respectfully decline to interfere with the judicial proceedings of a foreign sovereign."

### B. Foreign Anti–Suit Injunctions Generally

■ The parties agree that the court has the equitable power to issue a foreign anti-suit injunction. "It is beyond question that a federal court may enjoin a party before it from pursuing litigation in a foreign forum." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004) (citing *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 37 (2d Cir.1987)); *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 16 (1st Cir.2004) (similar); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 626 (5th Cir.1996) (similar); *Cargill, Inc. v. Hartford Accident & Indem. Co.*, 531 F.Supp. 710, 715 (D.Minn.1982) (similar); *see, e.g., Medtronic, Inc. v. Catalyst Research Corp.*, 664 F.2d 660, 661–66 (8th Cir.1981) (affirming district court's decision to grant preliminary injunction enforcing contractual agreement not to seek injunctive relief against the other party in foreign courts but permitting each to seek damages in foreign courts); *see also* Robin Cheryl Miller, Annotation, *Propriety of federal court*

Judgment and to Preserve the Status Quo of the Ownership of Goss Japan ("Emergency Motion"), counsel for TKS stated that "our [M]otion would have been really better ... phrased as conditions upon which [Goss's pending motion for] preliminary injunction should issue, if, in fact, the court were to issue a preliminary injunction enjoining TKS from bringing suit under the clawback statute

in Japan." Counsel for TKS requested that, "rather [than] view it as a separate proceeding, as a separate request, if Your Honor would ... respectfully consider it as part of the request that, should Your Honor issue the preliminary injunction ...." The court grants TKS's request, insofar as possible; it has reread the Emergency Motion and will attempt to present TKS's arguments in their best light.

*injunction against suit in foreign country,* 1986 WL 361603, 78 A.L.R. Fed. 831, § 2[a] (1986) ("A federal court's power to enjoin a party to a suit before the court from commencing ... litigation in a foreign country is apparently unquestioned.").

■ The parties also agree that the All Writs Act, 18 U.S.C. § 1651, empowers the court to issue an injunction barring TKS from filing suit under the Japanese Special Measures Law. The All Writs Act grants the court the power to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *see, e.g., Phillips Beverage Co. v. Belvedere, S.A.,* 204 F.3d 805, 806 (8th Cir.2000) (affirming district court's order, pursuant to the All Writs Act, that a party withdraw its application before the Customs Service because the application asked the Customs Service to do what the district court had already forbidden and the district court had an obligation to protect its judgment).

■ Even though a federal district court has the power to issue a foreign anti-suit injunction, it is not a power the court should exercise lightly or with abandon. "Determining the appropriateness of an international antisuit injunction is a highly nuanced exercise." *Quaak,* 361 F.3d at 16. "[P]rinciples of comity counsel that injunctions restraining foreign litigation be 'used sparingly' and 'granted only with care and great restraint.'" *Paramedics,* 369 F.3d at 652 (quoting *China Trade,* 837 F.2d at 36); *cf. Donovan v. City of Dallas,* 377 U.S. 408, 412, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964) ("Early in the history of our

country a general rule was established that state and federal courts would not interfere with or try to restrain each other's proceedings. That rule has continued substantially unchanged to this time." (Footnote omitted.)). Clearly, a federal district court should not lightly interfere with judicial proceedings in other sovereign nations. The foreseen and unforeseen consequences of the court's actions are potentially myriad and may manifest themselves at an international level. *See* George A. Bermann, *The Use of Anti–Suit Injunctions in International Litigation,* 28 Colum. J. Transnat'l L. 589, 604 (1990) ("Judicial interference with a foreign country's exercise of adjudicatory authority has a potential for embarrassing the political branches of government and disturbing our relations with that country.")

■ In sum, the court is cognizant that it must proceed with great caution before issuing a foreign anti-suit injunction—even if the injunction is issued only on a preliminary basis. A court must avoid a modern-day Scylla and Charybdis and "find a way to accommodate conflicting, mutually inconsistent national policies without unduly interfering with the judicial processes of a foreign sovereign." *Quaak,* 361 F.3d at 16 (citing *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 916 (D.C.Cir.1984)). As the First Circuit Court of Appeals recently recognized, this difficult task is "particularly formidable given the absence of guidance from the Supreme Court," "the paucity of precedent"[5] and an apparent circuit-split. *Id.; see also id.* at 16–17 (discussing split between circuit courts of appeals). In this case, the court must navigate these troubled waters in just two days.[6]

---

5. Although the *Quaak* court was referring to the fact that there are few First Circuit Court of Appeals cases on point, matters are worse in the Eighth Circuit. The parties cite no on-point Eighth Circuit Court of Appeals cases; it appears the Eighth Circuit Court of Appeals has never had the occasion to discuss the

standards for issuing a preliminary foreign anti-suit injunction. *But see Medtronic,* 664 F.2d at 661–66 (affirming grant of foreign anti-suit injunction).

6. Despite several abortive efforts, the parties called the undersigned this afternoon and in-

### C. Standards for Granting a Preliminary Injunction: Dataphase *factors*

 In the Eighth Circuit, applications for preliminary injunctions are generally measured against the standards set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). *See Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 444 F.3d 991, 994 (8th Cir.2006) (applying *Dataphase* factors).[7] The party moving for a preliminary injunction has the burden of establishing entitlement to such relief. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994) (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989) (en banc)). The court must consider four factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the grant of a preliminary injunction is in the public interest. *Dataphase*, 640 F.2d at 114. "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir.1986). A party moving for a preliminary injunction is required to establish a sufficient threat of irreparable harm. *Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir.1996). The district court has broad discretion when ruling on requests for preliminary injunctions and a reviewing court will reverse only for an abuse of discretion, clearly erroneous factual determinations or the application of an incorrect legal standard. *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).

The court now turns to consider the four *Dataphase* factors.

### 1. Likelihood of success on the merits

 The first factor the court must consider under *Dataphase* when ruling on Goss's Motion is the likelihood or probability of success on the merits. *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir.1994). In considering this factor, the court need not decide whether Goss ultimately will succeed on the movant's claims. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367,

---

formed her that they were unable to reach an agreement to give the court more time to consider this matter.

7. A number of other circuit courts of appeals have rejected the usual standards for measuring the merits of an application for a preliminary injunction in the context of an application for a foreign anti-suit injunction. *See, e.g., Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 364 (5th Cir.2003) ("Although both the district court and the parties discussed all four prerequisites to the issuance of a traditional preliminary injunction, the suitability of such relief ultimately depends on considerations unique to antisuit injunctions."); *see also E & J Gallo Winery v. Andina Licores, S.A.*, 446 F.3d 984, 990–91 (9th Cir.2006) (adopting Fifth Circuit approach and holding that movant "need not meet our usual test of a likelihood of success on the merits of the underlying claim" but instead "need only demonstrate the factors specific to an anti-suit injunction weigh in favor of granting the injunction"). These courts have narrowed the inquiry to whether the movant is likely to succeed on the merits, considering a number of factors specific to the propriety of anti-suit injunctions. *Karaha*, 335 F.3d at 364 n. 19. Because the Eighth Circuit Court of Appeals has not yet carved out such an exception to *Dataphase*, the court shall consider all four *Dataphase* factors. This decision is immaterial in the present case, however, because the court shall find that all four *Dataphase* factors weigh in favor of the issuance of a preliminary injunction.

371 (8th Cir.1991). Rather, the movant's success on the merits must be "at least . . . sufficiently likely to support the kind of relief it requests." *Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 488 (8th Cir.1993). Thus, a showing of likelihood of success on the merits requires simply that the moving party find support for its position in the governing law. *Baker Elec. Co-op.,* 28 F.3d at 1473–74.

#### a. Preliminary considerations

Goss contends that because it has prevailed on the merits of its claims under the 1916 Act, it has "already prevailed on the merits," and thus the first *Dataphase* factor weighs in favor of granting a preliminary injunction. The court cannot accept this argument. Goss's request for a permanent injunction and its original Complaint alleging a violation of the 1916 Act are separate legal issues—indeed, the latter was resolved at all levels of the federal judiciary days before the former was even filed. The court agrees with TKS that the correct question before the court on this *Dataphase* factor is "whether Goss is likely to prevail on its motion for an anti-suit injunction." *See In re Y & A Group Sec. Litig.,* 38 F.3d 380, 383 (8th Cir.1994) ("A preliminary injunction will only be issued where it appears that the petitioner is likely to succeed on the merits in proving that a permanent injunction is warranted"). The court shall thus consider the traditional standards by which courts have determined whether to grant foreign anti-suit injunctions. *See Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 335 F.3d 357, 364 (5th Cir.2003) (equating likelihood of success on merits standard with traditional standards by which courts have decided to grant foreign anti-suit injunctions); *see also Dataphase,* 640 F.2d at 113 ("At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.").

The Eighth Circuit Court of Appeals has not had the opportunity to indicate what standards apply for the issuance of foreign anti-suit injunctions. It is settled, however, that a foreign anti-suit injunction is only appropriate if the foreign litigation involves the same issues and parties as the federal action and if the federal action is dispositive of the foreign litigation. *E.J. Gallo Winery v. Andina Licores, S.A.,* 446 F.3d 984, 991 (9th Cir. 2006); *Paramedics,* 369 F.3d at 652; *Quaak,* 361 F.3d at 18; *Medtronic, Inc. v. Catalyst Research Corp.,* 518 F.Supp. 946, 955 (D.Minn.1981) ("The parties must be the same; the issue must be the same; and the resolution of the first action must be dispositive of the action to be enjoined." (Citations omitted.)), *aff'd on other grounds,* 664 F.2d 660 (8th Cir.1981); *see also Cargill,* 531 F.Supp. at 715 ("The threshold question is whether the parties are the same in both actions, the issues are the same, and resolution of the first action will be dispositive of the action to be enjoined."). In this case, the issues are the same and the United States action is dispositive of the foreign litigation. As Goss points out, the sole basis for Goss's liability under the Japanese Special Measures Law is Goss's receipt of damages awarded by this court. The judgment and jurisdiction of this court is thus intimately tied to any future action TKS might file under the Japanese Special Measures Law. The court also finds that the parties are the same. It is immaterial that the target of TKS's suit in Japan would in the first instance be Goss Japan, because Goss Japan is a subsidiary of Goss. *Medtronic,* 518 F.Supp. at 955.

### b. Circuit split

Beyond this threshold question, there is presently a circuit split as to what factors a court must consider before issuing an anti-suit injunction. *See Quaak,* 361 F.3d at 17 (discussing differences between the so-called "liberal approach," which the Fifth and Ninth Circuit Courts of Appeals have adopted, and the so-called "conservative approach," which the First, Second, Third, Sixth and D.C. Circuit Courts of Appeals have adopted) (reiterating nomenclature set forth in Note, *Antisuit Injunctions and International Comity,* 71 Va. L.Rev. 1039, 1049–51 (1985)); *see also Gau Shan Co., Ltd. v. Bankers Trust Co.,* 956 F.2d 1349, 1353 (6th Cir.1992) (similarly recognizing circuit split). The difference between the two approaches concerns how much weight the court should give to considerations of international comity. *See id. Compare Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 627 (5th Cir.1996) (inquiring as to whether international anti-suit injunction would "actually threaten relations" between nations), *with Quaak,* 361 F.3d at 18–19 (holding that courts must consider "the totality of the circumstances" and determine whether there is sufficient evidence to overcome a "rebuttable presumption" against international anti-suit injunctions). The Supreme Court has defined comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *accord Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa,* 482 U.S. 522, 543 n. 27, 107 S.Ct. 2542, 96 L.Ed.2d 461 ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states.").

### c. Analysis

The court finds that, under either the liberal or the conservative approach, Goss has met its burden. Even among those courts that afford international comity the greatest respect, it is settled that considerations of comity have diminished force when, as here, one court has already reached judgment. *See Paramedics,* 369 F.3d at 655 ("[W]here one court has already reached a judgment—on the same issues, involving the same parties—considerations of comity have diminished force."). As the D.C. Circuit explained:

> Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants. Thus, when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceedings.
>
> These situations may arise either before or after a judgment has been entered. The policies that guide the exercise of discretion vary slightly in each situation. When the injunction is requested after a previous judgment on the merits, there is little interference with the rule favoring parallel proceedings in matters subject to concurrent jurisdiction. Thus, a court may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation.

*Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 927–928 (D.C.Cir.1984) (footnotes omitted). Similarly, the First Circuit Court of Appeals writes:

Where ... a party institutes a foreign action in a blatant attempt to evade the rightful authority of the forum court, the need for an antisuit injunction crests. *See Laker Airways*, 731 F.2d at 929–30.... In technical terms, [the foreign action] may not constitute a frontal assault on the district court's jurisdiction, but the practical effect is the same. That is a matter of considerable import: a court has a right—indeed, a duty—to preserve its ability to do justice between the parties in cases that are legitimately before it. *See id.* at 930; *see also Davis,* 767 F.2d at 1039 (upholding an antisuit injunction as "necessary to ensure a complete adjudication of the matter before it").

*Quaak,* 361 F.3d at 20; *accord Mut. Serv. Ins. Co. v. Frit Indus., Inc.,* 358 F.3d 1312, 1324–25 (11th Cir.2004) (affirming district court's decision to permanently enjoin offshore insurers from litigating on the Isle of Man because the district court had already issued judgment on the merits and the " 'only conceivable benefit that [the foreign defendants] would reap if the district court's injunction were overturned would be the right to attack the pending United States action in a foreign court.' " (quoting *Laker Airways,* 731 F.2d at 915)).

The court finds that TKS's intended invocation of the Japanese Special Measures Law is a direct attack on this court's judgment in favor of Goss and a frontal assault on the jurisdiction of this court and the federal judiciary as a whole. "[A] direct interference with the jurisdiction of [an] United States court justifie[s] the defensive issuance of an antisuit injunction ..." *Gau Shan,* 956 F.2d at 1356 (citing *Laker Airways,* 731 F.2d at 915). In effect, TKS seeks to institute a lawsuit "for the sole purpose of terminating" this court's judgment in Goss's favor, thereby in a single filing attempting to undo six years of federal court litigation. *See id.* (discussing *Laker Airways* ). The court finds TKS's proposed litigation in Japan, after six years of litigation in the Untied States, is clearly vexatious and oppressive.

The court does not dispute the affidavit testimony of TKS's expert, Professor George Bermann, who opines that the issuance of an anti-suit injunction in this case would be deeply offensive to the Japanese government. The court is aware that the issuance of a preliminary injunction in this case may have international repercussions. Weighing all the factors and looking at this case in its procedural context, however, the court finds that its interest in protecting the integrity of its judgments and jurisdiction outweighs concerns over international comity.

The court's conclusion is strengthened by the unique circumstances of this case. The court's decision is consistent with the decisions of the legislative and executive branches of the United States government. When Congress passed the bill repealing the 1916 Act and the President signed it, the legislative and executive branches deliberately chose to enact a law that operates prospectively. Miscellaneous Trade & Technical Corrections Act of 2004, Pub.L. No. 108–429, § 2006(b), 118 Stat. 2434, 2597 (2004). Moreover, Congress was aware of this particular case, the jury's award and that the defendant was a Japanese company. *See* H.R. Rep. 108–415, at 17 (2004) ("The only 1916 Act case now pending is an Iowa case in which a jury found $10.5 million in actual damages against a Japanese company on December 3, 2003."). Congress and the President were also presumably aware that the Japanese government wanted a retroactive repeal of the 1916 Act. It was and remains the position of the Japanese government that the 1916 Act and this court's judgment was and is in violation of the United States' obligations as a member of the World Trade Organization. *See* Statement

of Senator Charles Grassley, Statements on Introduced Bills and Joint Resolutions (Senate, May 23, 2003), available at http://thomas.loc. gov; Bermann Declaration, *passim.* The fact that the legislative and executive branches were aware of this court's judgment and deliberately chose *not* to undo it through a retroactive repeal of the 1916 Act must inform the weight this court must give to international comity in this case. It is not the province of this court or the federal judiciary in general to rewrite the foreign policy of the United States government, as expressed by the legislative and executive branches of government. A recent discussion from the Eighth Circuit Court of Appeals, albeit in a different context, is instructive:

> Applying *Dataphase,* we look at the public's interest and the balance of the harms caused by a grant of injunctive relief on the one hand, and a failure to grant injunctive relief on the other. On these two factors, we give great weight to the fact that Congress already declared the public's interest and created a regulatory and enforcement framework that balanced the need for regulation against the harm of closure. As noted by the Supreme Court:
>
> "[a] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation. A district court cannot, for example, override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is ... for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute."

*In re Sac & Fox Tribe of Miss. in Iowa/Meskwaki Casino Litig.,* 340 F.3d 749, 760 (quoting *United States v. Oakland Cannabis Buyers' Co-op.,* 532 U.S. 483, 497–98, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) (internal citations and quotation marks omitted)).

Accordingly, the court finds the first *Dataphase* factor, likelihood of success on the merits, weighs in favor of granting a preliminary injunction in this case.

### 2. Threat of irreparable harm

The next factor the court must consider is the degree of irreparable harm, if any, Goss would suffer if the court does not grant the preliminary injunction. The party moving for a preliminary injunction generally may show irreparable harm by showing that the movant has no adequate remedy at law. *United States v. Grand Labs., Inc.,* 174 F.3d 960, 965 (8th Cir. 1999). Proof that an adequate legal remedy, such as a damages claim, exists supports an inference that no irreparable harm will occur. *Moore Business Forms, Inc. v. Wilson,* 953 F.Supp. 1056, 1062 (N.D.Iowa), *aff'd,* 105 F.3d 663 (8th Cir. 1996). The fact that a valid damages claim is available does not necessarily foreclose the issuance of injunctive relief, however, because money damages may not fully compensate a movant for less tangible injuries. *Id.*

The court finds that Goss would suffer great harm if the court does not grant the preliminary injunction. This harm is not limited to TKS's ability to clawback the judgment at issue from Goss's Japanese subsidiary, Goss Japan. At the Hearing, Goss's executive vice-president, chief financial officer and secretary, Joseph Patrick Gaynor, III, testified. Mr. Gaynor is a member of the Board of Directors of Goss Japan. Mr. Gaynor testified that Goss Japan is currently running a "break even operation." If TKS sues Goss Japan under the Japanese Special Measures Law, lenders might balk at loaning Goss Japan money. Goss Japan's customers—in es-

sence its unsecured creditors—would be wary to advance money for Goss Japan's products. Based on Mr. Gaynor's testimony and the court's own common sense, the court finds that the Japanese Special Measures Law poses a threat to the survival of Goss Japan and would thus harm Goss.

Accordingly, the court finds the second *Dataphase* factor, the threat of irreparable harm, weighs in favor of granting a preliminary injunction in this case.

### 3. Balance of harms

The court finds the threat of irreparable harm to Goss in this case outweighs the harm to TKS that may be occasioned by its inability to avail itself of the Japanese Special Measures Law while the court considers Goss's Motion for Permanent Injunction. The court will rule upon the Motion for Permanent Injunction expeditiously. This factor, therefore, weighs in favor of the issuance of the requested preliminary injunction.

### 4. Public interest

The final factor the court must consider in determining whether to issue the requested preliminary injunction is whether public interest favors preventing TKS from availing itself of the Japanese Special Measures Law while the court considers Goss's Motion for Permanent Injunction. The court finds that it does. The court incorporates by reference its discussion and findings regarding Congress's repeal of the 1916 Act in its analysis of the first *Dataphase* factor. It is clear that the public has an interest in preserving the jurisdiction of the federal judiciary. Moreover, the legislative and executive branches, acting in the public interest, have determined that the court's judgment should be enforced. This factor therefore weighs in favor of the issuance of the requested preliminary injunction.

### 5. Conclusion

Because all four *Dataphase* factors weigh in favor of the issuance of a preliminary injunction, the court shall grant Goss's Motion. The court stresses, however, that it does not purport to enjoin the government of Japan or the Japanese judiciary; rather, it is enjoining TKS from availing itself of the Japanese Special Measures Law. Even so, the court does not enjoin a party from availing itself of a foreign remedy lightly. The court also stresses that this is only a "preliminary assessment" pending consideration of Goss's request for a permanent injunction. *Medtronic*, 664 F.2d at 665. The court recognizes that "[t]he equities of this situation . . . may change." *Id.* The court finds, however, that, at this moment, justice requires it to intervene to preserve the *status quo* until the merits of Goss's request for a permanent injunction are determined after fuller consideration.

## IV. DISPOSITION

Goss's Motion for Preliminary and Permanent Injunctions (docket no. 512) is **GRANTED IN PART**. The court grants Goss's Motion insofar as it requests a preliminary injunction. The court enjoins TKS and their representatives, officers, directors, agents, attorneys, employees, and shareholders, and anyone acting in concert with them, from asserting or attempting to assert or pursue any rights or remedies granted under the Japanese Special Measures Law against Goss or any of its affiliates or subsidiaries. The court **RESERVES RULING** on Goss's Motion insofar as it requests a permanent injunction. The court shall establish an orderly

briefing schedule on the Motion in the near future.

**IT IS SO ORDERED.**